**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| PIPEFITTERS LOCAL UNION NO. 120 PENSION FUND, Derivatively and on Behalf of Nominal Defendant ABBOTT LABORATORIES, INC., <br><br> Plaintiff, <br><br> vs. <br><br> MILES D. WHITE, H. LAURANCE FULLER, ROXANNE AUSTIN, W. JAMES FARRELL, SAMUEL C. SCOTT, GLENN TILTON, WILLIAM OSBORN, ROBERT ALPERN, WILLIAM DALEY, W. ANN REYNOLDS, DAVID OWEN, ROY ROBERTS, WILLIAM SMITHBURG, BOONE POWELL, JR., <br><br> Defendants, <br><br> and <br><br> ABBOTT LABORATORIES, INC., <br><br> Nominal Defendant. | Civil Action No. _____ <br><br><br> JURY TRIAL DEMANDED |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ...................................................................................................1

JURISDICTION AND VENUE ..............................................................................8

THE PARTIES.........................................................................................................8

    A.    Plaintiff ...................................................................................................8

    B.    Nominal Corporate Defendants ............................................................9

    C.    The Director Defendants.......................................................................9

    D.    The Former Director Defendants ........................................................11

FACTUAL BACKGROUND ................................................................................12

    A.    Abbott's Drug Business Is Highly Regulated......................................12

        1.    The FDA Approves Drugs for Specific Uses Only Upon a Showing That the Drug is Safe and Effective for That Use.....................................12

        2.    The FDA Prohibits Abbott and Other Drug Companies From Marketing Drugs for Off-Label Uses.............................................13

        3.    Off-Label Marketing Violates the False Claims Act and Numerous State False Claims Acts ......................................................14

        4.    The Anti-Kickback Act Also Regulates Abbott's Marketing...................15

    B.    Abbott Flouted the Laws Governing It By Engaging in a Massive Off-Label Marketing Scheme Between 1998 and 2009 ...............................16

        1.    Depakote's Rise and Fall as a Blockbluster Drug and "Cash-cow" for Abbott..........................................................................16

        2.    Abbott's Illegal, Off-Label Depakote Marketing Scheme........................18

            i.    Between 1998 and 2009, Abbott Maintained the LTC Sales Force to Laud Off-Label Uses of Depakote and to Manipulate Healthcare Professionals...............................................22

            ii.    Abbott's Improper Use of Misleading Clinical Studies to Support Off- Label Uses for Depakote Products ...........................24

            iii.    Abbott Improperly Promoted Off-Label Uses of Depakote With Journal Supplements ............................................27

            iv.    Abbott Bribed "Key Opinion Leaders" to Increase Sales of Depakote for Off-Label Uses.......................................28

v.     Abbott Improperly Used Speaker Presentations to Promote Off-Label Uses of Depakote ........................................................28

vi.     Abbott Improperly Used CMEs to Further Promote Depakote Off-Label Uses ................................................29

vii.     Abbott Falsified Medical Education Requests for Off-Label Information About Depakote Products to Increase Sales of Depakote for Such Off-Label Uses...............................................30

viii.     Abbott Improperly Generated Scientific "Evidence" to Support Off- Label Uses of Depakote ...........................................31

ix.     Abbott Uses In-Services to Promote Off-Label Uses of Depakote ...................................................................32

x.     Abbott's Improper Detailing of Depakote Products to Healthcare Professionals and Improper Targeting of Their Pharmacy and Therapeutics Committees......................................32

xi.     Abbott Funded the Development and Use of Clinical Practice Guidelines to Tout Off-Label Uses of Depakote and to Mislead Healthcare Professionals .......................................34

xii.     Abbott's Improperly Paid Physicians of Preceptorships Monies to Induce Them into Prescribing Depakote Products............................................................................36

xiii.     Abbott Improperly Used OBRA-87 Limits on "Unnecessary Drugs" to Promote Off-Label Uses of Depakote in Long-Term Care Facilities ........................................36

C.     Defendants Had a Duty to Know How Depakote, a Key Product, Was Being Marketed, Did Know How It Was Marketed and Consciously Allowed Unlawful Off-Label Practices to Continue ............................37

    1.     Duties of the Company Directors .............................................37

    2.     At All Times, Defendants Knew That Off-Label Marketing Was Illegal and a Major Risk for the Company.................................41

    3.     Each Defendant Was Also Put On Notice of the Prohibition on Off-Label Marketing By a Long History of Government Investigations and Warnings Concerning Abbott's Marketing Practices ...................................................................................43

    4.     ███████████████████████████████████ ...............53

D.     The Government Investigation ........................................................60

DEMAND IS FUTILE...........................................................................................62

COUNT I .............................................................................................................65

PRAYER FOR RELIEF ........................................................................................................66

JURY DEMAND .................................................................................................................67

Pipefitters Local Union No. 120 Pension Fund ("Plaintiff" or "Pipefitters 120"), by and through its undersigned counsel, hereby makes the following allegations in its Verified Shareholder Derivative Complaint (the "Complaint") on behalf of Abbott Laboratories ("Abbott"), as the nominal defendant, against the Chairman and CEO of Abbott, Miles D. White, seven other current directors of Abbott (with White, the "Director Defendants"), and six former directors of Abbott (collectively, the "Individual Defendants"). The allegations herein are based upon Plaintiff's personal knowledge as to its own acts and on information and belief, including the investigation of counsel and review of publicly available information, including SEC filings, analyst reports, medical journal articles and confidential business records obtained from Abbott pursuant to 805 Ill. Comp. Stat. 5/7.75, as to all other matters.

## **INTRODUCTION**

1.      This shareholder derivative litigation seeks to hold Defendants liable for consciously allowing Abbott to unlawfully and systematically market Depakote, Depakote Sprinkles, Depacon, Depakene, Depakote ER and Depakote DR ("Depakote") to physicians and patients for off-label uses, a practice each Defendant knew was unlawful, thereby causing the Company to incur at least $1.3 to $1.5 billion in fees necessary to settle the civil and criminal liability against it and endangering the Company's ability to participate in Medicare, Medicaid and other state health programs that are critical to the Company's continued viability.

2.      It is an open secret that pharmaceutical companies engage in widespread marketing of their drugs to physicians and patients for uses that have not been approved by the U.S. Food and Drug Administration ("FDA"), so-called "off-label" uses, to generate billions of dollars in illicit revenues.   About 15% of all drug sales in the U.S. are for off-label purposes, amounting to approximately 10 million prescriptions a year.   *See* David Evans, "Pfizer Broke the Law by

1

Promoting Drugs for Unapproved Uses," *Bloomberg News,* Nov. 9, 2009. Pharmaceutical companies such as Abbott spend vast amounts of money to develop blockbuster name brand drugs that are protected from competition by patents for approximately 7 to 12 years and are therefore able to achieve premium pricing during that period. In order to maximize their return on investment, the companies want physicians to prescribe their drugs as widely as possible. By the unlawful practice of off-label marketing, also called misbranding of drugs, pharmaceutical companies can increase the sales of their product (measured by number of prescriptions or "scripts") to an expanded pool of patients who suffer from medical conditions for which the drug is not FDA-approved.

3.      While the law and the enforcement practices of the U.S. Food and Drug Administration ("FDA") categorically ban the misbranding of drugs by pharmaceutical companies, physicians are not under any similar prohibition. Physicians are permitted to prescribe *any* FDA-approved drug for *any* use (or medical "indication") including off-label use. The reason for this dichotomy is as follows: the FDA approves drugs only after careful study of clinical trial results and a balancing of the efficacy of the drug versus its risks. To ensure the safe use of a drug (meaning a cost benefit analysis results in its efficacy outweighing its risk) the FDA requires that pharmaceutical companies strictly market the drug only for the use or uses for which it was approved. Since neither the FDA nor pharmaceutical companies practice medicine, however, and doctors are the best arbiters of how best to treat their patients, physicians are permitted to dispense any approved drug for any medical indication. This regulatory structure allows for a potential loophole where drug companies can evade the consumer protections imposed by U.S. drug safety laws by disseminating misleading information to doctors in order to induce them to prescribe drugs for off-label uses.

4.      Unfortunately, the use of drugs off-label is often worthless or even dangerous for patients. Seventy-three percent of off-label drug use has little or no scientific merit, that is, no

benefit to the patients.  *See*  Tan, S.Y. "Off-label use of medications," *Wall Street Journal*, October

15, 2011.  Moreover, off-label drug use can pose significant health hazards to patients. For example,

Depakote has been linked to some life threatening side effects such as pancreatitis, liver damage and

suicidal thoughts in patients and to some serious, though not life threatening, side effects such as

cognitive impairments to babies born to mothers taking Depakote during pregnancy.   While these

risks may be worth taking to suppress disabling epileptic seizures or manic episodes of bipolar

affective disorder (for which Depakote is FDA-approved), they are not justified when doctors are

misled into prescribing Depakote based on the illusory benefits promoted by Abbott's marketing

department.

5.      Off-label drug use drives up the cost of health care for patients and taxpayers, who

often pay for the off-label prescriptions induced by Abbott and other drug companies through

government healthcare programs such as Medicare and Medicaid.   The ten million off-label

prescriptions made every year translates into billions of dollars in additional costs.  According to

Professor Jeffrey Avorn, a professor at Harvard Medical School, off-label promotion of drugs

imposes an "unbearable cost to a system that's going broke . . . we can't even afford to pay for

effective, safe therapies."[1]  Off-label marketing also constitutes Medicare fraud and violates the

False Claims Act ("FCA") because it causes the government to pay for drugs for uses not approved

by the FDA.

6.      Abbott, under the stewardship of Individual Defendants, has been one of the most

egregious law-breakers in the pharmaceutical industry.  As shown by the chart below, Abbott has

been embroiled in Medicare fraud scandals more times than its competitors and, counting the $1.5

---

[1] *See* David Evans, "Pfizer Broke the Law by Promoting Drugs for Unapproved Uses," *Bloomberg News,* Nov. 9, 2009.

billion set aside in 2011 for settling the Company's liability for off-label marketing of Depakote, Abbott's total amount of fines is $3.1 billion, significantly exceeding the fines paid by any of its competitors.[2]



**Fraud settlements**

The nation's largest drugmakers have paid billions in fines and entered corporate integrity agreements with Medicare to prevent fraud.

Fines (in billions)

**Pfizer**
2002 $0.049
2004 $0.430
2009 $2.3

**Johnson & Johnson**
2010 $0.081

**Merck**
2008 $0.650
2010 $0.950

**Abbott Laboratories**
2001 $0.875
2003 $0.600
2010 $0.126

**Eli Lilly**
2010 $1.4

**Bristol-Myers Squibb**
2010 $0.515

Sources: Securities and Exchange Commission; Departments of Justice and Health and Human Services.
By Julie Snider, USA TODAY

7.     This pervasive, persistent, illegal behavior is clearly not the result of management repeatedly making innocent mistakes. Abbott's top management, including its CEO and directors, have chosen to risk Abbott's future by allowing the Company to operate in a manner that breaks the law, including by engaging in off-label marketing of one of its most important drugs, and in

---

[2] A review of the most recent SEC Form 10-Ks for these companies did not reveal any additional relevant fines altering the fact that Abbott has paid the most fraud fines.

Medicare fraud, in order to chase short term profits. By engaging in off-label marketing, Abbott risks devastating consequences, including a felony conviction for the Company that would render its drugs ineligible for reimbursement by state health programs and federal Medicare. Because of the pervasive role of government payments in the medical industry, disbarment would likely cause Abbott's demise as a going concern.

8.      To date, the primary tool used by the U.S. government to enforce the prohibition against misbranding their products by the pharmaceutical industry has been Consent Decrees known as Corporate Incentive Agreements ("CIAs") and imposition of fines that, while large, recoup only a small fraction of the illicit gains created by off-label marketing. For example, the $2.3 billion fine paid by Pfizer in 2009 for off-label marketing of Bextra and three other drugs represented only 14% of its $16.8 billion in revenue from selling those medicines between 2001 and 2008. The penalties paid by Eli Lilly in connection with the off-label marketing of Zyprexa represented only 4% of the $36 billion that the drug generated between 2000 and 2008.

9.      Essentially, Defendants are gambling that they and Abbott can "get away with" indefinitely inflating Abbott's revenues through illegal off-label marketing and paying back a small percentage of their ill-gotten gains if they get caught. As Lon Schneider, a professor at the University of Southern California's Keck School of Medicine, has described, "***There's an unwritten business plan. . . They're drivers that knowingly speed.  If stopped, they pay the fine and then they do it again***."[3]

10.    Defendants were "knowingly speeding" with respect to the off-label marketing of Depakote. The recently unsealed whistleblower complaints of Thomas Spetter, Meredith McCoyd

---

[3] *See* "Pfizer Broke the Law by Promoting Drugs for Unapproved Uses," Nov. 9, 2009, *Bloomberg News*

and Tamara Dietzler detail at length how, between 1998 and 2009, "[i]n order to address the stagnation of profits. . . Abbott embarked upon several centrally-organized, illegal marketing schemes to convince physicians to prescribe Depakote for a number of diseases and disorders for which the drug had (and continues to have) no FDA-approved indication." These unlawful campaigns, which the Defendants, at a minimum, consciously disregarded and did nothing to stop, were particularly egregious in that vulnerable populations such as the elderly, institutionalized individuals and children were targeted to drive up prescriptions of Depakote even though the efficacy of the drug for the promoted uses (such as agitation in the elderly and attention deficit hyperactivity disorder in children) was either not known or known to be worthless.

11.     Depakote is a valproic acid and is in a class of medications known as anticonvulsants. While the exact pharmacological action is unknown, Depakote has an ability to increase brain levels of the inhibitory neurotransmitter gamma amino butyric acid (GABA). It is a powerful drug that is known to be effective for some patients with certain maladies, but causes serious side effects in others. The FDA requires that it carry a "black box" warning. A black box warning is the strongest form of warning of adverse side effects issued by the FDA; it is a step taken just short of removing the drug from the market. Depakote was approved by the FDA in 1983 for the treatment of simple and complex seizures associated with epilepsy in adults. Its approved use was expanded by the FDA over the ensuing decades to include treatment of acute mania or mixed episodes suffered by adult patients with bipolar affective disorder, certain types of epileptic seizures in children over the age of ten, and for the prevention of migraine headaches.

12.     Depakote was one of Abbott's most important drugs. For example, between 2005 and 2008, years for which Abbott released figures for its U.S. Depakote sales, Depakote accounted for between 8% and 11% of its total U.S. sales.

13. ██████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████[4]█████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████ Yet, in violation of their fiduciary duties of good faith and loyalty to Abbott,

Individual Defendants allowed the Abbott employees █████████████████████

██████████████████████████ to blithely break the law by making misleading representations to

physicians, pharmacies, and  nursing homes to generate prescriptions for the drug.

14. The U.S. government is now prosecuting Abbott for 10+ years of willful off-label

marketing and the resultant Medicare fraud and False Claims Act violations.  It is not presently clear

what the ultimate legal ramifications will be for Abbott or how many of the Defendants will be

individually prosecuted. █████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

---

[4] █████████████████████████████████████████████

███████████████████████████████████

████████████████████ Further, each Defendant faces a substantial likelihood of liability under the False Claims Act and for breach of fiduciary duty (*See infra* ¶¶167-70). Moreover, Abbott has reserved $1.5 billion to cover its potential liability, and has reportedly agreed to settle the claims of the U.S. government and twenty-four states in exchange for $800 million in civil penalties and $500 million in criminal penalties, large penalties that underscore the serious nature of the wrongdoing. This action seeks to recoup some of these losses. In addition, Abbott has a moral and legal obligation to its shareholders and customers to change the way it markets its drugs. This action seeks to force the Company to enact reforms that will cause it to finally comply with these obligations.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds the jurisdictional amount of $75,000, exclusive of interest and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) because nominal defendant Abbott is headquartered in this District. Moreover, a substantial portion of the occurrences complained of herein occurred in this District. In addition, one or more of the Defendants either reside in, or maintain offices in, this District.

## THE PARTIES

**A.      Plaintiff**

17.     Plaintiff Pipefitters Local Union No. 120 Pension Fund is an Ohio-based pension fund and current shareholder of Abbott. As of the date of this Complaint, Pipefitters 120 held 5,900 shares of Abbott and has held shares continuously since January 4, 2007. On December 12, 2011,

Plaintiff exercised its right as a shareholder to inspect Abbott's books and records under 805 Ill. Comp. Stat. 5/7.75 by sending a letter to Defendant Miles D. White demanding to inspect certain Abbott books and records concerning off-label marketing of Depakote. On January 11, 2012, counsel for Plaintiff received a letter from counsel for Abbott stating that Abbott would agree to produce a subset of the requested documents if Plaintiff agreed to enter into a confidentiality agreement that required Plaintiff to file under seal any documents reflecting confidential business records. On February 24, 2012, Abbott produced 3,310 pages of documents, many of which were redacted.

### B.    Nominal Corporate Defendants

18.    Nominal defendant Abbott is an Illinois corporation with its principal place of business in Abbott Park, Illinois. According to its public filings, Abbott's principal business is the discovery, development, manufacture and sale of health care products. Like many pharmaceutical companies, Abbott derives large portions of its revenues from a few blockbluster drugs that it has developed and for which Abbott holds the patent. Patent protection shields Abbott's name-brand drugs from generic competition and allows Abbott to sell its drugs at premium prices while the patent lasts. Depakote was one of Abbott's most important drugs, generating billions of dollars in revenue and accounting for between 8% and 11% of Abbott's U.S. sales in the years 2005-2008. Depakote remained a significant source of revenue through the expiration of the patent on Depakote ER in early 2009, and the off-label marketing continued at least to that point.

### C.    The Director Defendants

19.    Defendant Miles D. White ("White") is Abbott's Chief Executive Officer ("CEO") and Chairman of its Board. White has served as a director of the Company since 1998, and became its CEO in 1999. Upon information and belief, White is a citizen of Illinois. This is not the first time

that White has faced serious charges that he has breached his fiduciary duty to Abbott shareholders by failing to act in good faith to ensure the Company's compliance with the law. In *In re Abbott Laboratories Derivative Shareholders Litigation*, 325 F.3d 795 (7th Cir. 2003), the Seventh Circuit found that the plaintiffs in that action had adequately pled that White had not acted in good faith to correct violations of FDA regulations governing the manufacture of certain Abbott products.

20.     Defendant H. Laurance Fuller ("Fuller") has served as a director of the Company since 1988. Fuller has been a member of the Board's Nominations and Governance Committee since 2003, and currently serves as its Chairman. Upon information and belief, Fuller is a citizen of Illinois. The Seventh Circuit in *Abbott* found that plaintiffs had adequately alleged that Fuller had failed to act in good faith to correct violations of FDA regulations governing the manufacture of certain Abbott products.

21.     Defendant Roxanne S. Austin ("Austin") has served as a director of the Company since 2000. Austin has been a member of the Board's Audit Committee since 2007, currently serving as its Chairman, and has continuously served as a member of the Board's Public Policy Committee since 2003. Upon information and belief, Austin is a citizen of California.

22.     Defendant W. James Farrell ("Farrell") has served as a director of the Company since 2006. Farrell has been a member of the Board's Nominations and Governance Committee since 2006. Upon information and belief, Farrell is a citizen of Illinois.

23.     Defendant Samuel C. Scott, III ("Scott") has served as a director of the Company since 2007. Scott has been a member of the Board's Audit Committee since 2007. Upon information and belief, Scott is a citizen of Illinois.

24.     Defendant Glenn F. Tilton ("Tilton") has served as a director of the Company since 2007.  Tilton has been a member of the Board's Audit Committee since 2007.  Upon information and belief, Tilton is a citizen of Illinois.

25.     Defendant William A. Osborn ("Osborn") has served as a director of the Company since 2008.  Osborn has been a member of the Board's Nominations and Governance Committee since 2010.  Upon information and belief, Osborn is a citizen of Illinois.

26.     Defendant Robert J. Alpern, M.D. ("Alpern") has served as a director of the Company since 2008.  Alpern has been a member of the Board's Public Policy Committee since 2009.  Upon information and belief, Alpern is a citizen of Connecticut.

27.     Defendants White, Fuller, Austin, Farrell, Scott, Tilton, Osborn, and Alpern are collectively referred to as the "Director Defendants."  The Director Defendants comprise a majority of Abbott's twelve-person Board of Directors at the time of the filing of this Complaint.

28.     The Director Defendants, along with Defendants Daley, Reynolds, Owen, Roberts, Smithburg and Powell, collectively are referred to as Individual Defendants.

**D.      The Former Director Defendants**

29.     Defendant William Daley ("Daley") served as a director of the Company from 2004 to 2011.  Daley was a member of the Board's Public Policy Committee from 2004 to 2009.  Upon information and belief, Daley is a citizen of Illinois.

30.     Defendant W. Ann Reynolds, Ph.D. ("Reynolds") served as a director of the Company from 1980 to 2010. Reynolds was a member of the Board's Public Policy Committee from 1999 to 2009, serving as its Chairman since 2003. Reynolds was also a member of the Board's Audit Committee from 1994 to 2001, and a member of the Nominations and Governance Committee from

at least as early as 1997 to 2000 and again from 2003 to 2009. Upon information and belief, Reynolds is a citizen of Florida.

31.     Defendant the Rt. Hon. Lord David Owen ("Owen") served as a director of the Company from 1996 to 2010. Owen was a member of the Board's Audit Committee and Nominations and Governance Committee from at least as early as 1997 to 2010. Upon information and belief, Owen is a citizen of the United Kingdom.

32.     Defendant Roy Roberts ("Roberts") served as a director of the Company from 1998 until 2011. Roberts was a member of the Board's Public Policy Committee from 1999 to 2011, serving as its Chairman in 2010, and was a member of the Board's Nominations and Governance Committee from 1998 to 2011. Upon information and belief, Roberts is a citizen of Michigan.

33.     Defendant William Smithburg ("Smithburg") served as a director of the Company from 1982 to 2011. Smithburg was a member of the Board's Public Policy Committee from 1999 to 2003, serving as its Chairman from 1999 to 2002, and was a member of the Board's Audit Committee from 2002 to 2011. Upon information and belief, Smithburg is a citizen of Illinois.

34.     Defendant Boone Powell, Jr. ("Powell") served as a director of the Company from 1985 to 2008. Powell was a member of the Board's Public Policy Committee from 2004 to 2008, and was a member of the Board's Audit Committee from at least as early as 1997 to 2003. Upon information and belief, Powell is a citizen of Texas.

## FACTUAL BACKGROUND

**A.      Abbott's Drug Business Is Highly Regulated**

**1.      The FDA Approves Drugs for Specific Uses Only Upon a Showing That the Drug is Safe and Effective for That Use**

35.     Abbott's drug business is subject to regulation under the FDCA, 21 U.S.C. §301, *et seq.*, and regulations promulgated by the FDA.

36.     Prior to 1962, drug companies could market their drugs for any use. However, in the wake of the realization that the drug Thalidomide, a drug that had been used to treat morning sickness in pregnant patients, had caused thousands of children to be born with severe birth defects, the FDCA was amended to require drug companies to prove that their drugs are safe and effective for specific uses.

37.     Under the FDCA, 21 U.S.C. §§301-97, new pharmaceutical drugs cannot be marketed or sold in the United States unless the sponsor of the drug demonstrates to the satisfaction of the FDA that the drug is safe and effective for each of its intended uses. 21 U.S.C. §355(a), (d). The determination of "safe and effective" is granted to a drug only after clinical testing. The FDA relies on information provided by a drug's manufacturer. Applications for FDA approval (known as New Drug Applications or "NDAs") must include "full reports of investigations which have been made to show whether or not such drug is safe for use and whether such drug is effective in use." 21 U.S.C. § 355(b)(1)(A).

38.     The FDA approves a drug only if there are "adequate and well-controlled clinical investigation[s]" that demonstrate a drug's safety and effectiveness for its "intended conditions" of use. *See* 21 U.S.C. §355(d)(7). The "intended conditions" for use of a drug are listed in the drug's labeling, which is reviewed and approved by the FDA. *See* 21 U.S.C. §355(d)(1) & (2). When a company seeks to expand the intended conditions of an already approved drug for a new use, it must make similarly supported showing. *See, e.g.*, 21 C.F.R. §314.81.

## 2.     The FDA Prohibits Abbott and Other Drug Companies From Marketing Drugs for Off-Label Uses

39.     The FDCA prohibits drug manufacturers from marketing or promoting their drugs for uses not approved by the FDA, though physicians may prescribe drugs that have been approved by the FDA for any use. *See* 21 U.S.C. §§ 331, 352, 355; 21 C.F.R. § 314.81. Pursuant to the FDCA's

regulation, drug labels may not describe intended uses for the drug that have not been approved by the FDA. 21 U.S.C. §§ 331, 352. The term "drug label" is broadly defined and includes all marketing and promotional materials relating to that drug. *Id.* Illegal "misbranding" can result in civil and criminal penalties. *See* 21 U.S.C. § 333.

40. Absent an unsolicited request from a physician, federal laws prohibit any advertising that recommends or suggests an off-label use for an approved drug. The FDA has interpreted "advertising" to include a significant amount of speech that would not typically be considered advertising. *See* Final Guidance on Industry-Supported Scientific and Educational Activities, 62 Fed. Reg. 64,074 (Dec. 3, 1997). Specifically, any manufacturer's speech explaining one of its products is considered to be an "advertisement" for the product and is subject to the prohibitions against off-label marketing contained in 21 C.F.R. §202.1.

**3.      Off-Label Marketing Violates the False Claims Act and Numerous State False Claims Acts**

41. Many drug prescriptions are paid for by federal health programs such as Medicaid and Medicare and are therefore subject to the False Claims Act ("FCA"). Originally enacted in 1863, the FCA is the most frequently used of a handful of extant laws creating a form of civil action known as *qui tam*, which is an action by an individual not affiliated with the government asserting violations of federal law against another private entity. If successful, the *qui tam* plaintiff, or whistleblower, may collect a portion of the penalty assessed against the defendant.

42. The FCA imposes civil liability upon "[a]ny person" who, *inter alia*, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the U.S. Government. 31 U.S.C. §3729(a). Currently, each violation of the FCA subjects the violator to a civil penalty of not less than $5,500 and not more than $11,000. In addition, a violator is liable for three times the amount of all damages sustained by the U.S. Government.

43.     Federal government health programs limit their reimbursements for prescription drugs to drugs that have been deemed safe and effective under the FDCA.  *See, e.g.*, 42 U.S.C. §1396r-8(k)(2) (Medicaid) and 42 U.S.C. §1395w-102(e)(1)(A) (Medicare).  Off-label marketing violates the FCA because it causes false claims for payment to be submitted to the government for prescriptions that are not supported by the medical evidence and have not been approved by the FDA.  The off-label marketing strategies adopted by Defendants fraudulently induced Medicare, Medicaid and other federal programs to make billions of dollars in payments for Depakote prescriptions that were not approved as safe and effective under the FDCA and should not have been paid for by Medicaid or Medicare.   As set forth in the *Spetter qui tam* complaint, off-label marketing also violates numerous state False Claims Act laws.  These state FCA acts may be violated, for example, when a state-administered Medicaid program is induced to make a false payment for a drug because of off-label marketing.

**4.     The Anti-Kickback Act Also Regulates Abbott's Marketing**

44.     The Anti-Kickback Act ("AKA") was passed in 1986, the same year the FCA was amended, and is part of the same federal government effort to prevent corruption in government contracts.

45.     41 U.S.C. §8702 (formerly 41 U.S.C. §53) provides that:

"A person may not –

(1) provide, attempt to provide, or offer to provide a kickback;

(2) solicit, accept, or attempt to accept a kickback; or

(3) include the amount of a kickback prohibited by paragraph (1) or (2) in the contract price

(A) a subcontractor charges a prime contractor or a higher tier subcontractor; or

(B) a prime contractor charges the Federal Government."

46.     41 U.S.C. §8706 (formerly 41 U.S.C. §55) provides that for each kickback there shall be a civil penalty amounting to (1) twice the amount of each kickback involved in the violation plus (2) not more than $10,000 for each kickback.

47.     The AKA prohibited Abbott from providing payments or gifts to physicians to induce them to prescribe Depakote.

**B.     Abbott Flouted the Laws Governing It By Engaging in a Massive Off-Label Marketing Scheme Between 1998 and 2009**

**1.     Depakote's Rise and Fall as a Blockbluster Drug and "Cash-cow" for Abbott**

48.     There are several different dosage forms for Depakote, but the active ingredient in all the Depakote products is valporic acid. Depakene, a liquid form of Depakote, was first approved in 1978 for the treatment of seizures. Depakote was first approved in 1983 to treat simple and complex absence seizures[5] in adult epilepsy.

49.     Depakote Sprinkles is the capsule form of Depakote. It consists of a pull-apart capsule and is designed for its contents to be mixed with soft food to assist patients who have difficulty swallowing medications in tablet form. It was approved by the FDA in 1989 as safe and effective for some expanded types of epileptic seizures.

50.     Depacon is the intravenous form of Depakote. It was approved in 1996 for the treatment of patients with (a) complex seizures that occur either in isolation or in association with with other types of seizures, (b) for use as a sole and adjunctive therapy in the treatment of patients with simple and complex absence seizures, (c) for adjunctive therapy in patients with multiple seizures that include absence seizures.

---

[5] Absence seizures are brief (usually less than 20 seconds), generalized epileptic seizures of sudden onset and termination. They have two essential components: (i) clinically the impairment of consciousness (absence) and (ii) EEG generalized spike-and-slow wave discharges.

51.     Depakote DR is a delayed-release version of Depakote.  The FDA approved Depakote DR for treatment of simple and complex absence seizures in adults (1983), manic episodes in adults in bipolar disorder, complex partial seizures in adults and children older than ten (1996) and prevention of migraine (1996).

52.     Depakote ER (or extended release), was first approved in 2000 for the prevention of migraines in adults.  In 2003, Depakote ER was approved for the treatment of certain types of epileptic seizures for children ages 10-17.  In 2005, Depakote ER was approved for the treatment of mania episodes of bipolar disorder.  The only approved pediatric use of Depakote is for treatment of certain specified types of seizures in children ten and older, and approval is only granted for Depakote DR and ER.

53.     Depakote has been a huge commercial success for Abbott, generating billions of dollars for the Company.

54.     Between 2005 and 2008, the period when Abbott released its figures for U.S. Depakote sales, Depakote was a primary driver of Abbott's economic success, accounting for billions in revenue and between 8% and 11% of Abbott's total domestic revenue.

**Domestic Sales of Depakote**

| Year | Depakote Sales (U.S.) | Abbott Total Sales (U.S.) | % of Total U.S. Sales Contributed by Depakote |
|------|----------------------|--------------------------|-----------------------------------------------|
| 2005 | $1 (billion) | $12.71 (billion) | 8 % |

| 2006 | $1.2 (billion) | $12.00 (billion) | 10 % |
| 2007 | $1.50 (billion) | $13.25 (billion) | 11 % |
| 2008 | $1.30 (billion) | $14.50 (billion) | 9 % |

55.     Much of Depakote's success depended on reimbursements paid through federal government healthcare programs such Medicaid, Medicare Part D, VA and FEHBP.   According to the *Spetter* complaint, Abbott collected almost $8 billion in Medicaid payments alone for prescriptions for Depakote products, with the bulk of the reimbursements – almost $5 billion – concentrated between 1998 and 2008, the period when Defendants were consciously allowing Abbott employees to engage in off-label marketing.

**2.     Abbott's Illegal, Off-Label Depakote Marketing Scheme**

56.     Several *qui tam* complaints have been filed, and joined by the U.S. government and various state governments, by former sales representatives of Abbott.  These whistleblowers detail a widespread, centralized scheme at Abbott to engage in off-label marketing of Depakote between 1998 and 2009 that was "condoned by the highest levels of Abbott management."

57.     In *United States of America ex rel. Thomas J. Spetter, Jr. v. Abbott Laboratories, Inc.*, 10-cv-00006 (D. W. Va. Feb. 4, 2011), *United States of America ex rel. Meredith McCoyd v. Abbott Laboratories*, 07-cv-00081 (D. W. Va. Feb. 4, 2011) and *United States of America ex rel. Tamara L. Dietzler v. Abbott Laboratories*, 09-cv-00051 (N.D. Ill. April 7, 2009), the relators made highly specific factual allegations that Abbott and numerous Abbott officials engaged in the off-label marketing and promotion of the Company's Depakote products as part of Abbott's standard operating practice and thus, that Abbott and the other defendants breached their fiduciary duties.  For example:

• Abbott "engaged in a scheme since January 1, 1998 and continuing until January 1, 2009 to submit and/or cause to be submitted hundreds of thousands of false claims to federal and state health

care programs by systematically and illegally promoting Depakote®, Depakote Sprinkles®, Depakote ER® . . . for unapproved, off-label uses in long-term care facilities, assisted living facilities, mental retardation/developmentally disabled . . . facilities and other like facilities . . . throughout the United States. . . . These false claims cheated the federal and state Governments out of hundreds of millions of dollars that should not have been paid, thereby enriching the Defendants, and subject[ing] patients to non-approved, ineffective, and unsafe uses of the Depakote® products."[6]

• "Abbott Laboratories . . . methodically and recklessly endangered . . . those with Alzheimer's and other forms of dementia—through the illegal marketing of [Depakote] *a drug that Abbott knew was unapproved for the treatment of Alzheimer's, did not work to treat the disease, and was actually dangerous for use by the elderly*. Incredibly, Abbott did not limit its wrongful conduct to preying upon the elderly; it also unlawfully marketed its drug, Depakote, to an array of patient populations, including children, placing them at risk for life altering injury or illness."[7]

• The majority of the use of the Depakote® products was off-label.[8] For example, by 2000, an estimated *85 to 90 percent of the LTC use of Depakote products was off-label*. Approximately 85 percent of this population were Medicare and Medicaid patients.[9]

58.     Between 1998 and 2009, Abbott Labs engaged in off-label promotion of its Depakote products in myriad illegal ways, as more fully set forth herein. Specifically, Abbott promoted its Depakote products off-label to treat various health issues and diseases, including:

---

[6] Complaint at ¶ , *United States of America ex rel. Thomas J. Spetter, Jr. v. Abbott Labs*, 10-cv-00006 (D. W. Va. Feb. 4, 2011).

[7] Complaint at ¶1, *United States of America ex rel. Meredith McCoyd v. Abbott Labs.*, 07-cv-00081 (D. W. Va. Feb. 4, 2011) (emphasis added).

[8] *Ex rel. Spetter* Complaint at ¶ 91.

[9] *Id.* at ¶ 141.

i.   To treat aggression in adults and children who were mentally retarded and/or developmentally disabled, although the FDA never approved Depakote to treat aggression in any patient population;[10]

ii.  For the treatment of psychiatric conditions in children and adolescents;[11]

iii. For the adjunctive treatment of schizophrenia;[12]

iv.  For the management and treatment of substance abuse in bipolar disorder;[13]

v.   For the treatment of post-traumatic stress disorder and intermittent explosive disorder;[14]

vi.  For the treatment of borderline personality disorder;[15]

vii. For the treatment of bipolar depression;[16]

viii. For the treatment of "symptoms of mania";[17]

ix.  Promoting Depakote ER for uses for which only Depakote had received approval.[18]

---

[10] *Ex rel Spetter* Complaint at ¶¶ 314-22.

[11] *Id.* at ¶¶ 340-45.

[12] *Id.* at ¶¶ 297-312; *Dietzler* Complaint at ¶¶ 81-85.

[13] *Id.* at ¶¶ 333-34; *Ex rel. McCoyd* Complaint at ¶¶ 204-07.

[14] *Ex rel. Spetter* Complaint at 335-39.

[15] *Id.* at ¶¶ 346-50.

[16] *Id.* at ¶¶ 351-53; *Ex rel. McCoyd* Complaint at ¶¶ 175-94.

[17] *Ex rel. Spetter* Complaint at ¶¶ 354-56.

[18] *Id.* at ¶¶ 357-60.

59.     Abbott Labs illegally marketed and promoted Depakote, Depakote Sprinkles and Depakote ER for the treatment of agitation and aggression associated with dementia in the elderly and for numerous other conditions.[19]

60.     Abbott Labs "regularly engaged in deceptive and misleading promotion of the safety of the Depakote® Products, even downplaying serious known health risks.  Sales representatives were instructed to detail the fact that Depakote® Products were safe to use and had fewer side effects than competing drugs" when there was no evidence that this was true.  In fact, Depakote is a black box drug that needs to be closely monitored by the treating physician.  "Abbott engaged in a widespread promotion of the Depakote® Products as safe to treat the elderly suffering from dementia despite having warnings on the label against the risks of such use."[20]

61.     "Since at least 1998, Abbott's sales representatives were to (and did) provide healthcare professionals nationwide with Abbott-approved materials to influence the off-label prescribing of the Depakote® Products, including 'approved' clinical studies, industry supplements, and [Continuing Medical Education] CME materials."[21]  Executives at Abbott failed to comply with the regulatory requirement that Abbott submit such promotional materials to the FDA for approval.

62.     Abbott designed its promotion to influence physicians to write more prescriptions for the Depakote products, including for numerous off-label uses.  Abbott's sales representatives were trained that they were selling the validity of both Abbott's study and Depakote at the same time.[22]

---

[19] *Id.* at ¶¶75-78.

[20] *Id.* at ¶ 90.

[21] *Id.* at ¶ 107.

[22] *Id.* at ¶ 108.

63.     For the reasons more fully set forth below, Abbott violated myriad federal and state laws and regulations.  In addition, Abbott also violated its own internal policies and procedures, or in some instances, failed to implement any such policies and procedures.  Abbott knowingly, fraudulently and illegally marketed and promoted its Depakote products for unapproved, off-label uses.

> **i.     Between 1998 and 2009, Abbott Maintained the LTC Sales Force to Laud Off-Label Uses of Depakote and to Manipulate Healthcare Professionals**

64.     In January 1998, the Neuroscience Franchise of the Pharmaceutical Division of Abbott Labs created a special cadre of sales persons known as the LTC (Long Term Care) Sales Force to market Depakote and Depakote Sprinkles.  The LTC Sales Force later marketed Depakote ER.

65.     Abbott created the LTC Sales Force specifically to maximize sales for agitation and aggression associated with the treatment of elderly patients with dementia, a symptom for which there was no evidence Depakote provided any relief.  Moreover, the targeted patients, elderly persons with dementia who were largely institutionalized, were particularly vulnerable to suffering medicinal side effects, and required careful monitoring.[23]  Members of the LTC Sales Force were expressly instructed to ignore previous instructions to only sell Depakote on-label.  Instead, they were told that their primary sales opportunities would be to sell Depakote off-label for agitation and aggression in the treatment of dementia.[24]

---

[23] *Id.* at ¶ 113.

[24] *Id.* at ¶ 115.

66.     Furthermore, Abbott trained its LTC Sales Force to use the following techniques and/or enhancements to increase the sales of Depakote:

a.      Up-front discounts through a charge-back system to minimize customer outlays and avoid rebate calculations;

b.      Rebate contracts based on market share performance;

c.      Bundled product deals in connection with programs implemented to affect market share performance favorably for a particular product or products;

d.      Extended dating, which allowed pharmacy providers to improve cash flow by deferring payments;

e.      Price protection (purportedly within the scope of applicable state and federal rules); and

f.      Availability of specialized packaging intended for the LTC market.[25]

67.     Abbott further instructed its LTC Sales Force to provide myriad kickbacks, unrelated to drug contracting, specifically to influence pharmaceutical market share in the nursing facility through control over physician prescribing habits and access to nursing facility patients by providing value-added programs, including:

a.      Regional/local educational symposia for physicians and nurses;

b.      Nursing in-service programs;

c.      Market research;

d.      Clinical research;

e.      New product information;

---

[25] *Id.* at ¶ 116.

f.      Advisory boards; and

g.      Support for clinical programs (formulary maintenance, therapeutic interchange programs, disease management programs, and targeted therapeutic recommendations).[26]

68.     When Abbott first introduced its LTC Sales Force in 1998, it was comprised of approximately 30 Charter Members.  By 2001 it had expanded to 60 sales representatives and by 2003, it had ballooned to over 100 such sales representatives.  As the number of LTC Sales Force sales representatives promoting off-label uses increased, so too did the sales associated with off-label uses.[27]

69.     In 2004, to disguise its off-label promotion of Depakote products from regulatory bodies, Abbott merged the LTC Sales Force into its hospital group and renamed the new, combined group as its Special Account Executive Institutional Sales Group.  The name change did not alter Abbott's course of illegal off-label promotion and marketing; Abbott continued to promote illegal, off-label uses of Depakote.[28]

70.     On January 1, 2009, Abbott eliminated the Special Account Executive Institutional Sales Group.[29]

### ii.     Abbott's Improper Use of Misleading Clinical Studies to Support Off-Label Uses for Depakote Products

71.     As part of its fraudulent and misleading marketing scheme, Abbott funded a placebo-controlled, randomized study, M97-738.  If this study produced favorable results, Abbott planned on

---

[26] *Id.* at ¶ 117.

[27] *Id.* at ¶ 120.

[28] *Id.* at ¶ 121.

[29] *Id.* at ¶ 123.

using it in its application with the FDA to promote its Depakote products for mania associated with dementia. Instead of waiting for the final results and any FDA approval, however, Abbott began promoting the results in advance. Abbott even released an internal update, to its LTC Sales Force, detailing the M97-738 Study. To facilitate this Study, Abbott dispatched a team of Neuroscience Medical Liaisons to visit all of the nursing home clinical sites to conduct in-services with the staff. Essentially, these were just additional off-label presentations for Abbott's Depakote products.[30]

72.     The "advantage" for targeting nursing homes with elderly institutionalized patients for use of Depakote to, in effect, chemically sedate agitated patients was that such prescriptions could be filled on a "standing order" basis. That means that a physician need not see the patient every time the drug is prescribed. If the patient is perceived to be agitated, Depakote can be prescribed by a health care worker as a "standing order." While the advantage for sales figures of the use of "standing orders" is that it can drive the usage of Depakote very quickly, the obvious disadvantage for the elderly, often frail population in nursing homes who are susceptible to side effects is that they are often left without close medical monitoring.[31]

73.     The principal investigator for this M97-738 Study, Dr. Pierre Tariot, was a paid Abbott consultant. On July 21, 1998, Dr. Tariot announced the **preliminary** results of this Study, reporting that "[m]edicines commonly used to treat epilepsy and other seizure disorders appear to be effective at soothing the agitation in people with Alzheimer's disease and other forms of dementia."[32]

---

[30] *Ex rel. Spetter* Complaint at ¶¶ 173-74.

[31] *Ex rel. Spetter* Complaint at ¶¶ 270-74. See also *Dietzler* Complaint at ¶ 65F.

[32] *Ex rel. Spetter* Complaint at ¶ 175.

74.     In stark contrast to his announced preliminary results, Dr. Tariot's final results were not positive.  Due to a disproportionate number of dropouts from the Study (seemingly due to excessive patient somnolence and weight loss), the M97-738 Study had to be terminated prior to its full enrollment.  This termination renders the study "negative," and it could not even be presented to the FDA.  Nevertheless, Abbott executives steadfastly and stubbornly insisted that the Study would be used to promote Depakote products for off-label uses, specifically, in the treatment of elderly patients with dementia who exhibited mania symptoms.  Abbott provided thousands of copies of the "results" of its M97-738 Study to its LTC Sales Force for distribution in its off-label promotion.[33]

75.     Abbott's LTC Sales Force was instructed to laud the merits of the M97-738 Study, even though Abbott executives knew that the Study was deemed "negative" due to its early termination.  Abbott instructed the LTC Sales Force to explain that the Study demonstrated "the safety, efficacy and ease of use in treating agitation and aggression in dementia patients."  The LTC Sales Force was even instructed to misrepresent and try to "explain away" the somnolence and weight loss issues demonstrated by the Study.  Again, this promotion was off-label and illegal.[34]

76.     In 2005, Dr. Tariot reported a study in which he found that Depakote showed "no benefit" for the treatment of agitation in dementia.  The trial for this study was actually completed in 2002, but Abbott executives refused to release the results for approximately three years.  Furthermore, Abbott never provided reprinted copies of this clear negative study to its sales representatives for dissemination.[35]

---

[33] *Id.* at ¶¶ 176-77, 179.

[34] *Id.* at ¶ 180.

[35] *Id.* at ¶ 188.

77. In addition to the failed M97-738 Study led by Dr. Tariot, Abbott also funded and relied on other studies to promote the off-label use of its Depakote products. This includes the M98-817 Study led by Dr. Anton Porsteinsson where Abbott again leaked results early, misrepresented the results and ultimately used the study for promotion of off-label uses. Perhaps worse, Abbott actually used the results of this M98-817 Study to quell the negative aspects of its M97-738 Study, even though the M98-817 Study specifically stated that it did not prove that such drugs would actually achieve the represented goal. [36]

### iii. Abbott Improperly Promoted Off-Label Uses of Depakote With Journal Supplements

78. Abbott also used non-peer-reviewed articles appearing in supplements to medical journals to promote off-label uses of Depakote. Abbott again organized a Continuing Medical Education ("CME") seminar to present information that appeared to be, but was not, free from Abbott's influence. Specifically, they were funded by unrestricted educational grants by Abbott and were authored by Abbott-paid consultants. Three such articles were:

i. A 1999 article entitled "Phenomenology and Treatment of Aggression Across Psychiatric Illnesses," an article funded by an unrestricted educational grant by Abbott and the authors of which both were consultants paid by Abbott;

ii. A February 2001 article entitled "Bipolar Disorder & Impulsive Spectrum Letter," again funded by an unrestricted educational grant by Abbott and again authored by a consultant paid by Abbott; and

---

[36] *Id.* at ¶¶ 181-87.

iii.    An April 2005 article entitled "Case Studies: Management of Epilepsy in Persons With Intellectual/Developmental Disabilities With or Without Behavioral Problems," which again was funded by an Abbott grant and authored by Abbott-paid researchers. [37]

79.    Similarly, Abbott's LTC Sales Force published summaries of studies as supplements to journals.  The LTC Sales Force also distributed thousands of copies of such supplements to healthcare professionals as part of their off-label promotional details for Depakote products.[38]

### iv.    Abbott Bribed "Key Opinion Leaders" to Increase Sales of Depakote for Off-Label Uses

80.    Abbott's LTC Sales Force and subsequent Special Account Executive Institutional Sales Group developed a core marketing strategy of identifying "key opinion leaders," who were physicians who would influence their peers' medical practice and especially their prescription habits. Abbott provided these "key opinion leaders" with a multitude of improper and illegal kickbacks, including sports tickets, dinners, golf outings, speaker honoraria and long term consulting agreements.  In exchange for these kickbacks, the "key opinion leaders" would provide advocacy and key marketing feedback and activities in support of Abbott's Depakote products.  Abbott even assigned the "key opinion leaders" into three levels; the higher the level, the better or more valuable the kickback would be.[39]

### v.    Abbott Improperly Used Speaker Presentations to Promote Off-Label Uses of Depakote

---

[37] *Id.* at ¶¶ 189-92.

[38] *Id.* at ¶ 193.

[39] *Id.* at ¶¶ 195-98.  See also *Dietzler* Complaint at ¶¶ 128-66.

81.     Promotional programs funded by pharmaceutical companies like Abbott are highly regulated by the FDA.  Such programs must be on-label, must contain a "fair balance" of information regarding the drug and must be truthful and not misleading, among other requirements.[40]

82.     Beginning in at least as early as 1998, Abbott, via its LTC Sales Force, set up hundreds of speaker programs for healthcare professionals at which illegal, off-label promotional presentations were made, in direct violation of FDA regulations.  Abbott selected and compensated the speakers.  In other words, these speaker programs were another way that Abbott illegally and improperly developed "key opinion leader" product allegiance.[41]

<h3>vi.     Abbott Improperly Used CMEs to Further Promote Depakote Off-Label Uses</h3>

83.     CME courses, usually local medical lectures featuring "key opinion leaders," are a valuable source of information for physicians.  The standards promulgated by the Accreditation Council for Continuing Medical Education ("ACCME"), however, require that CMEs be independent from drug companies.  The ACCME also requires that independent educational grants cannot be tied to the purchase, sale, prescription or recommendation of the company's products, there can be no price concessions and there can be no payments to ensure that the grant recipient markets the company's drugs during the educational program.[42]

---

[40] *Ex rel. Spetter* Complaint at ¶ 199.

[41] *Id.* at ¶¶ 201-21.

[42] *Id.* at ¶¶ 222-23, 225.  See also *Dietzler* Complaint at ¶ 65G; *Ex rel. McCoyd* Complaint at ¶¶ 129-53.

84.     Abbott regularly violated the requirements set forth by the ACCME, its own guidelines and the FDA guidance by manipulating the CME programs into blatant promotional events for off-label uses of Depakote products.[43]

85.     Beginning at least as early as 1998, Abbott contracted with ABcomm, Inc., to set up CME programs using recognized clinical experts, well recognized in their field ("key opinion leaders"), to conduct CMEs and product promotional programs.  Indeed, until at least 2005, Abbott had exclusive control over which speakers were selected for the ABcomm CME programs.  Furthermore, Abbott had complete control over the topics and slides such speakers were permitted to use, as well as what audience would be invited to hear the presentations.  In every conceivable way, Abbott controlled these CME programs.  Again, Abbott illegally and improperly used these CME programs not to educate as to the fair approved uses of Depakote, but to promote its off-label uses.[44]

86.     Abbott's relationship with ABcomm is obviously inappropriate.  With respect to these CME programs, ABcomm was merely a puppet of Abbott.  To receive funding in the form of "educational grants" from Abbott, ABcomm had to follow Abbott's orders, with respect to topics, speakers and all other conceivable issues that Abbott could control.[45]

### vii.     Abbott Falsified Medical Education Requests for Off-Label Information About Depakote Products to Increase Sales of Depakote for Such Off-Label Uses

87.     Abbott also increased off-label promotion of its Depakote products by manipulating requests for "Medical Education Requests" from the Abbott Medical Information Department.  A

---

[43] *Ex rel. Spetter* Complaint at ¶ 227.

[44] *Id.* at ¶¶ 228-29, 240-58.

[45] *Id.* at ¶¶ 230, 232.

"Medical Education Request" is Abbott's in-house term for a physician request for off-label information for one of Abbott's drugs.[46]

88.     With respect to the Company's Depakote products, Abbott's management encouraged sales representatives to solicit Medical Education Requests to make it appear that physicians had asked for this information, when in reality, it was merely the sales representative generating the Request.  Abbott even ran internal sales contests to see which sales representative could get the most Medical Education Requests.   Thousands of these Medical Education Requests for off-label information about Depakote products were improperly solicited from physicians.  Abbott executives knew or should have known that this conduct was illegal and improper, but because the practice generated increased sales of Depakote products, Abbott encouraged it.[47]

### viii.     Abbott Improperly Generated Scientific "Evidence" to Support Off-Label Uses of Depakote

89.     Abbott executives carefully crafted pre-determined, easily marketable "key messages," to support off-label use of Depakote products, instead of utilizing scientific evidence derived from unbiased scientific inquiry.  One such example of this was Abbott's fraudulent promotion of the neuroprotective effects of its Depakote products, which Abbott trained its LTC Sales Force to utilize as a centerpiece of Abbott's fraudulent marketing scheme.  An article entitled, "Neuroplasticity and cellular resilience in mood disorders," whose author was Manji, was not peer-reviewed, not a double-blind study, and suggested that Abbott's Depakote products exhibited neuroprotective effects.  Despite the obvious flaws of the Manji article, Abbott instructed its LTC

---

[46] *Id.* at ¶ 265.

[47] *Id.* at ¶¶ 266-69.

Sales Force to utilize it to support Abbott's position of off-label uses of its Depakote products, especially for treatment of Alzheimer's.[48]

### ix. Abbott Uses In-Services to Promote Off-Label Uses of Depakote

90.     Abbott's LTC Sales Force also conducted in-services for nursing home staff and consultant pharmacists.   At these in-services, Abbott sales representatives illegally promoted Depakote products for off-label uses.[49]

91.     Abbott also funded a 1998 CME in-service on a CD, which included a videotape entitled "Treatment of Aggression in Elderly Dementia Patients."  In the videotape presentation, again, funded by Abbott, the physicians inevitably selected Depakote as the drug to best treat the elderly patient's aggression associated with dementia.   This presentation, as well as the entire contents of the CD, promoted off-label uses of Depakote products. [50]

92.     Abbott created (and funded) other in-services on CD that depicted similar situations to that discussed above.  All of these presentations illegally promoted off-label uses of Depakote products.[51]

### x. Abbott's Improper Detailing of Depakote Products to Healthcare Professionals and Improper Targeting of Their Pharmacy and Therapeutics Committees

93.     Abbott, per the Government, also engaged in unlawful "detailing" of its Depakote products.  Detailing is the one-on-one promotion of drugs to physicians by pharmaceutical sales representatives, usually through regular office visits, free gifts, and friendly advice, when drug

---

[48] *Id.* at ¶¶ 279-80.

[49] *Id.* at ¶ 152.

[50] *Id.* at ¶ 153.

[51] *Id.* at ¶¶ 154-58.

representatives go directly to physicians' offices to describe the benefits of a specific drug. While detailing is a lawful practice, if engaged in to promote the tested and FDA-approved uses of the drug, Abbott executives incentivized its sales force, on a nationwide basis, to go well beyond the lawful boundaries of detailing. The "detailing" included "lunch 'n learns," breakfasts, dinner meetings, preceptorships, grand rounds, mini-fellowships and in-service training for the purposes of disseminating Depakote products' brand message of off-label uses and thereby increasing sales.[52]

94.    Many healthcare organizations, including hospitals, institutional pharmacies, state Medicaid agencies and managed healthcare organizations maintain lists of preferred drugs that can be prescribed by healthcare professionals in that organization or which are eligible for reimbursement by that organization, which lists are commonly referred to as "formularies." The Pharmacy and Therapeutics ("P&T") Committee of such an organization decides which drugs should be included in a formulary. These P&T Committees are designed to be independent and are in place specifically to look out for the best interests of patients. P&T Committees are instructed to avoid conflicts when making formulary decisions.[53]

95.    Abbott, through its LTC Sales Force, routinely engaged in promotions to P&T Committees to add Depakote products to their formularies. Abbott sales representatives: (1) singled out P&T Committee members for special attention to influence their decisions to add Depakote to their formularies; (2) provided details and in-services to P&T Committee members touting the off-label uses of the Depakote products; and (3) called on P&T Committee members for special promotions when a formulary decision was pending to add Depakote ER, including unsupported

---

[52] *Id.* at ¶ 142, 145.

[53] *Id.* at ¶ 146.

superiority claims concerning Depakote ER.[54]  In January, 2009, Abbott's Regulatory Manager Rick Leber was issued a Warning Letter that described how Abbott used a Flashcard for pharmacy formularies that misstated the uses of Depakote ER over Depakote to push pharmacies to use the extended release product that still had six months left of patent protection over the July 2008 patent expiration of non-extended use or ordinary Depakote.  (*Infra* ¶ 132).

> xi.  **Abbott Funded the Development and Use of Clinical Practice Guidelines to Tout Off-Label Uses of Depakote and to Mislead Healthcare Professionals**

96.  A vital aspect of Abbott's scheme for off-label promotion of its Depakote products was the development and use of "clinical practice guidelines" ("CPGs").  CPGs are summaries of "expert opinions" which are often used to identify standards of care, an important source of drug information for physicians.  CPGs are typically formulated by panels of experts who are, however, partially or fully supported financially by pharmaceutical manufacturers like Abbott.  CPG expert panelists also often have economic ties to the drug industry via research grants or speaker fees.[55]

97.  In April 1998, with partial financial support from Abbott, McGraw Hill published purportedly "independent" CPGs entitled, "Treatment of Agitation in Older Persons with Dementia, A Postgraduate Medicine Special Report."  These CPGs were updated in 2001 and again in 2005; both updates were also funded by Abbott.[56]

98.  The CPGs published by McGraw Hill provided a set of dementia management guidelines for physicians treating the elderly.  These CPGs required the use of the most expensive drugs on the market including Depakote, Depakote Sprinkles and (after FDA approval in 2000)

---

[54] *Id.* at ¶ 147.

[55] *Id.* at ¶¶ 124-25.

[56] *Id.* at ¶ 128.

Depakote ER as first-line treatment for dementia patients, even though this was not a use approved by the FDA.[57]

99.     The initial creation of these McGraw Hill CPGs was underwritten by educational grants from Abbott and other pharmaceutical companies.  Among the "Expert Consensus Panelists" were numerous physicians with financial relationships with Abbott.  Improperly, the CPGs failed to disclose any of these relationships.[58]

100.     Once these partially Abbott-funded CPGs were released with the headline Abbott wanted (Depakote as first line treatment for off-label uses), Abbott provided major funding to disseminate copies of these CPGs to healthcare professionals caring for LTC patients throughout the United States.  For one example, Abbott hired Insight Therapeutics, LLC to produce a "pocket" version of these CPGs to be used as part of the CME courses that Abbott sponsored.  Abbott sponsored this pocket guide via an unrestricted educational grant.  In essence, Abbott paid for this pocket guide, and then used it extensively to promote off-label uses of the Depakote products.  Similarly, Insight Therapeutics also produced a CD version of these CPGs, again funded by an Abbott educational grant.  Abbott controlled all of the content in this CD, which again promoted off-label uses of the Depakote products.[59]

101.     These same CPGs were also transformed—again partially via Abbott financial support—into a promotional piece entitled "Treatment of Dementia and Agitation: A Guide for Families and Caregivers."  This piece unabashedly promoted the off-label use of Depakote.[60]

---

[57] *Id.* at ¶ 129.

[58] *Id.* at ¶¶ 130-31.

[59] *Id.* at ¶¶ 132-34.  See also *Dietzler* Complaint at ¶ 65B.

[60] *Ex rel. Spetter* Complaint at ¶ 136.

102.     Abbott's LTC Sales Force regularly used the pocket guide and CD containing the CPGs in their promotion of off-label uses of Depakote products to healthcare professionals, specifically as first-time treatment of the elderly suffering from agitation and aggression associated with dementia.[61]

103.     Through these various CPG-related tools, all at least partially funded by Abbott, Abbott deliberately engaged in the illegal promotion of its Depakote products for off-label uses. Abbott deliberately bypassed governmental safeguards and scientific review.[62]

104.     As a result of its illegal off-label promotions, sales of Abbott's Depakote products soared.

### xii.     Abbott's Improperly Paid Physicians of Preceptorships Monies to Induce Them into Prescribing Depakote Products

105.     Abbott's LTC Sales Force also paid key high-decile physicians to perform preceptorships to influence their prescribing of Depakote products.    These preceptorship arrangements are in direct violation of the Anti-Kickback Act.  *See* "OIG Compliance Program Guidance for Pharmaceutical Manufacturers," 68 Fed. Reg. 23731.[63]

### xiii.     Abbott Improperly Used OBRA-87 Limits on "Unnecessary Drugs" to Promote Off-Label Uses of Depakote in Long-Term Care Facilities

106.     The Omnibus Budget Reconciliation Act of 1987 ("OBRA-87") requires each LTC facility to employ an outside consulting pharmacist to be responsible for the quality of pharmaceutical services.  OBRA-87 prohibits the use of unnecessary drugs and also addresses the use of anti-psychotic drugs.  Residents at LTC facilities who have not previously received anti-

---

[61] *Id.* at ¶ 135.

[62] *Id.* at ¶ 137.

[63] *Id.* at ¶¶ 159-62.

psychotic drugs are specifically prohibited from receiving them unless such therapy is necessary to treat a specific condition, as diagnosed and documented in the resident's clinical record.[64]

107.    Beginning at least as early as 1999, Abbott developed a plan to promote the Depakote products' off-label use as superior to psychotropic drugs, using OBRA-87 limits as the focal point. OBRA-87 did not designate Depakote products as being anti-psychotic.  Thus, Abbott's marketing scheme highlighted: (1) the off-label use of the Depakote products as replacements for anti-psychotics and anti-anxiety medications; and (2) the flexibility enjoyed by prescribing the Depakote products off-label, which did not exist with traditional anti-psychotics that were subject to OBRA-87's limits.[65]

## C.  Defendants Had a Duty to Know How Depakote, a Key Product, Was Being Marketed, Did Know How It Was Marketed and Consciously Allowed Unlawful Off-Label Practices to Continue

### 1.  Duties of the Company Directors

108.    Each Individual Defendant, as a current or former director of the Abbott Board of Directors, knew, from Abbott's recent history of substantial fines and penalties, and the FDA's new aggressive enforcement of off-label marketing prohibitions, the importance to a pharmaceutical company of maintaining strict and effective oversight of its employees to ensure compliance with federal and state marketing laws and regulations.

109.    By reason of their positions as Directors of the Company, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith and candor, and were and are required to use their utmost ability to control and manage the Company in a fair,

---

[64] *Id.* at ¶¶ 163-67; 42 C.F.R. § 483.60.

[65] *Ex rel. Spetter* Complaint at ¶¶ 168-70.  See also *Ex rel. McCoyd* Complaint at ¶¶ 84-97.

just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit "the long term and short term interests of the corporation," 805 Ill. Comp. Stat. 5/8.85 which includes, of course, the obligation that the Company act in compliance with the law and ethical good behavior.

110.    Pursuant to 805 Ill. Comp. Stat. 5/8.75 which sets forth the grounds on which directors of Illinois corporations may be indemnified, each Individual Defendant has a duty to "act in good faith and in a manner he or she reasonably believe[s] to be in or not opposed to the best interests of the corporation" and "with respect to any criminal action or proceeding, ha[s] no reasonable cause to believe his or her conduct was unlawful."

111.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of the Company, and was at all times acting within the course and scope of such agency.

112.    According to Abbott's Corporate Governance Guidelines, the Abbott Board is required to "comply with all laws, rules and regulations applicable to their capacity as directors of Abbott," and to "report violations of laws, rules, regulations or the Code of Business Conduct to the Chairman of the Board and Chief Executive Officer, the Vice President and Chief Ethics and Compliance Officer, or any other appropriate Abbott personnel." Furthermore, the Governance Guidelines state that "[e]ach director shall have complete access to Abbott's management. Abbott's management will make itself available to answer the directors' questions about Abbott between meetings."

113.    In addition to the Governance Guidelines, Abbott's Code of Business Conduct (the "Code"), which applies to Individual Defendants, emphasizes Abbott's "core values of honesty, fairness and integrity." For example, the Code provides:

### Principle 8: Compliance With Laws

We are required to familiarize ourselves with all the laws, rules and regulations that apply in the areas within the scope of our work responsibilities, including, as applicable, the following areas. Contact the Legal Division for advice in any area where you have questions.

### Food and Drug Laws

We must comply with all applicable laws, rules, regulations, consent decrees and other orders of the United States Food and Drug Administration and any other similar governmental authorities in other countries where Abbott does business governing research, development, manufacture, distribution and promotion of foods, drugs, medical devices, diagnostic products, nutritional products or biological products.

*** 

### Laws Relating to Government Health Care Programs

We must comply with the laws relating to government health care programs in each country where Abbott does business.

In the United States, its territories and possessions, and Puerto Rico, many Abbott products are reimbursed or purchased by Federal Health Care Programs -- programs that include Medicare, Medicaid, Department of Defense and Department of Veterans Affairs health care programs, and many other Federal or Federally-funded programs that pay for health care items and services. These programs are regulated through a variety of laws affecting the coverage and reimbursement of Abbott products, as well as the sale and marketing of those products.

Abbott is committed to full compliance with all Federal Health Care Program requirements, including the following:

#### Federal Anti-kickback Statute

The laws that regulate these programs include the Federal anti-kickback statute, which applies both to our sales and marketing activities and to a broad range of other activities, including grants, research contracts, and consulting agreements. It generally prohibits offering or paying (or soliciting or receiving) cash or other benefits to induce the purchase, order, or recommendation of products eligible for payment by a Federal Health Care Program.

[T]o ensure Abbott's compliance with the anti-kickback statute, we must carefully evaluate and properly structure any arrangements with parties in a position to prescribe, purchase or recommend Government-reimbursed

products (for example, physicians, hospitals, nursing facilities, HMOs, PGMs, GPOs, or pharmacies), and must always avoid any arrangements that could inappropriately influence treatment or purchasing decisions.

**False Claims Laws**

The civil False Claims Act and other statutes prohibit knowingly or recklessly submitting false claims to the Government, or causing others to submit false claims. Accordingly, we must exercise care to ensure that we do not submit any inaccurate or otherwise improper claims for payment to the Government, or cause others to do so. Abbott contracts with Government customers and must avoid submitting any claims for payments not properly due. While Abbott does not itself submit claims to insurance programs like Medicare and Medicaid, many of our customers do. We must avoid any conduct that could lead customers to submit false claims by following procedures carefully designed to ensure that any information we provide to customers about Medicare or Medicaid reimbursement for our products is accurate and otherwise proper.

*** 

**Civil Monetary Penalties Law**

This law authorizes the imposition of civil monetary penalties for a variety of conduct. . . .

Failure to adhere to Federal Health Care Program requirements, or to related Abbott standards, policies and procedures, can have a number of serious consequences, both for Abbott and for the individuals involved. . . . ***[V]iolation of these laws may result in exclusion of Abbott or individual employees from participation in Federal Health Care Programs.*** (emphasis added).

114. There are five committees of the Abbott Board of Directors which further delineate the additional duties of the Directors who serve on those committees: the Executive Committee, the Audit Committee, Compensation Committee, Nominations and Governance Committee and Public Policy Committee.

115. Director Defendants Austin, Scott and Tilton all served on the Audit Committee from 2007 until the present, and former directors Owen, Smithburg and Powell served on the Audit Committee from 1997-2010, 2002-2011, and 1997-2003 respectively. As such, each of these Individual Defendants had a specific duty to "assist the Board in fulfilling its oversight responsibility

with respect to . . . legal and regulatory compliance as it relates to financial matters, including accounting, auditing, financial reporting, and securities law issues." Audit Committee Charter ¶1. In addition, Defendants Austin, Scott, Tilton, Owen, Smithburg and Powell, as members of the Audit Committee, had a duty "to assist the Board in fulfilling its oversight responsibility with respect to . . . Abbott's enterprise risk management, including major financial risk exposures. . . ."

116.    Director Defendants Austin and Alpern served on the Public Policy Committee from 2003 to the present, and 2009 to the present respectively, and former directors Daley, Smithburg and Powell served on the Committee from 2004 to 2009, 1999-2003 and 2004-2008 respectively. While the exact wording of the Public Policy Committee Charter changed somewhat over time, its purpose always remained the same, and that was "to assist the Board in fulfilling its oversight responsibility with respect to public policy (*including regulation by the Federal Food and Drug Administration* as well as other domestic, foreign and international regulatory bodies) and government affairs and healthcare compliance issues that affect Abbott . . . ." (Emphasis added).

## 2.    At All Times, Defendants Knew That Off-Label Marketing Was Illegal and a Major Risk for the Company

117.    As described above, the overlapping prohibitions on off-label marketing imposed by the Food, Drug and Cosmetic Act, the False Claims Act, the Anti-Kickback Act and regulations promulgated by them, the FDA and Medicare/Medicaid were long-standing and prominent aspects of Abbott's pharmaceutical business, and each Defendant was well aware of these prohibitions and the importance to the Company to comply with these laws.

118.    Each Defendant was keenly aware of the prohibition on off-label marketing. For example, Defendants White, Fuller, Austin, Farrell, Scott, Tilton, Osborn, Daley, Reynolds, Owen, Roberts, Smithburg and Powell described in Abbott's SEC Form 10-K for the year ending December

31, 2007, which each Defendant signed, that this prohibition was a fundamental aspect of Abbott's

business:

> *The development, manufacture, sale, and distribution of Abbott's products are subject to comprehensive government regulation. Government regulation by various federal, state, and local agencies,* both domestically and abroad, which includes detailed inspection of, and controls over, research and laboratory procedures, clinical investigations, product approvals and manufacturing, *marketing and promotion,* sampling, distribution, record keeping, storage, and disposal practices, and achieving compliance with these regulations, substantially increases the time, difficulty, and costs incurred in obtaining and maintaining the *approval to market newly developed and existing products. Government regulatory actions can result in delay in the release of products, seizure or recall of products, suspension or revocation of the authority necessary for their production and sale, and other civil or criminal sanctions.* In addition, governmental regulatory agencies require prescription drug and medical device manufacturers to pay fees, such as application, product, and establishment fees.

119.    Similarly, the 2007 SEC Form 10-K stated:

> *Abbott is subject to numerous governmental regulations and it can be costly to comply with these regulations and to develop compliant products and processes.*
> \*       \*       \*
> *Abbott's products are subject to rigorous regulation by the U.S. Food and Drug Administration, and numerous international, supranational, federal and state authorities.* The process of obtaining regulatory approvals to market a drug or medical device can be costly and time-consuming, and approvals might not be granted for future products, or additional indications or uses of existing products, on a timely basis, if at all.
> \*       \*       \*
> *Abbott must incur expense and spend time and effort to ensure compliance with these complex regulations. Possible regulatory actions could include warning letters, fines, damages, injunctions, civil penalties, recalls, seizures of Abbott's products and criminal prosecution.* These actions could result in, among other things, substantial modifications to Abbott's business practices and operations; refunds, recalls or seizures of Abbott's products; a total or partial shutdown of production in one or more of Abbott's facilities while Abbott or Abbott's suppliers remedy the alleged violation; the inability to obtain future pre-market clearances or approvals; and withdrawals or suspensions of current products from the market. Any of these events could disrupt Abbott's business and have a material adverse effect on Abbott's revenues, profitability and financial condition.

120.     The 2007 SEC Form 10-K also acknowledged each Defendant's awareness of the regulations imposed by Medicaid and Medicare and the need for Abbott to comply with the anti-kickback and false claims laws:

> ***Laws and regulations affecting government benefit programs could impose new obligations on Abbott, require Abbott to change its business practices, and restrict its operations in the future.***
>
> ***Abbott's industry is also subject to various federal, state and international laws and regulations pertaining to government benefit program reimbursement, price reporting and regulation, and health care fraud and abuse, including anti-kickback and false claims laws, the Medicaid Rebate Statute, the Veterans Health Care Act and individual state laws relating to pricing and sales and marketing practices. Violations of these laws may be punishable by criminal and/or civil sanctions***, including, in some instances, ***substantial fines***, ***imprisonment*** and ***exclusion from participation*** in federal and state health care programs, including Medicare, Medicaid, and Veterans Administration health programs. These laws and regulations are broad in scope and they are subject to evolving interpretations, which could require Abbott to incur substantial costs associated with compliance or to alter one or more of its sales or marketing practices. In addition, violations of these laws, or allegations of such violations, could disrupt Abbott's business and result in a material adverse effect on Abbott's revenues, profitability and financial condition.

121.     These quotations are merely a sampling. Many other contemporaneous statements by Abbott confirm that the prohibition on off-label marketing was known to be a fundamental aspect of Abbott's business.

**3.      Each Defendant Was Also Put On Notice of the Prohibition on Off-Label Marketing By a Long History of Government Investigations and Warnings Concerning Abbott's Marketing Practices**

122.     Each Defendant was on notice that off-label marketing was illegal because Abbott has repeatedly been penalized, warned or reprimanded about its illegal marketing behavior.

123.     In 2001, TAP Pharmaceutical Products Inc. ("TAP"), an Abbott joint venture with Takeda Pharmaceutical Company, entered into an agreement with the United States Department of Justice to settle an investigation involving TAP's illegal marketing of its prostate cancer drug, Lupron. In the settlement of civil and criminal liability for violating the Prescription Drug

Marketing Act, the False Claims Act and for filing false and fraudulent claims with fifty states and the District of Columbia, TAP agreed to pay $885 million.

124.    Following the identical prosecution pattern as the current case of illegal marketing of Depakote, the government's investigation into illegal marketing of Lupron began with whistleblower lawsuits initiated by several TAP employees. The unlawful conduct included some of the very same conduct charged in the *Spetter*, *McCoyd*, and *Dietzler qui tam* actions regarding Depakote, such as offering to give things of value, including free drugs, so-called educational grants, trips to resorts, free consulting services, medical equipment, and forgiveness of debt, to physicians and other customers to obtain their referrals of prescriptions for Lupron to Medicare program beneficiaries, in violation of the anti-kickback statute. Following the $885 million fine, the U.S. Attorney in Massachusetts indicted and tried eight executives of TAP on charges of conspiracy to pay bribes and kickbacks to doctors and hospitals. Although the executives were acquitted after a three-month jury trial in 2004, U.S. Attorney Michael J. Sullivan released a statement following trial stating the government "remains committed to the aggressive investigation and prosecution of criminal conduct by corporations and individuals in the healthcare industry." BOSTON GLOBE, July 15, 2004.

125.    On August 23, 2001, the *Chicago Tribune* reported that another division of Abbott, the Ross Products Division, was being investigated for a similar but different kickback scheme ("Ross Investigation"). At issue, according to the *Chicago Tribune*, was whether the medical product manufacturers engaged in a kickback scheme to encourage hospitals, nursing homes or home-care providers to buy pumps and related supplies used to feed seriously ill people by giving the products away or selling them at a discount. Some providers then allegedly billed the products at a higher price to either Medicare, the federal health insurance program for the elderly, or Medicaid, the federal-state health insurer for the poor.

126.     On July 23, 2003, Abbott settled the Ross Investigation, incurring charges of approximately $622 million. As part of the settlement, C.G. Nutritionals, a division of Ross, pled guilty to a federal charge of Obstruction of a Criminal Investigation of Health Care Offenses, which was entered on October 27, 2003.

127.     The settlement also obligated Abbott to enter into a comprehensive Corporate Integrity Agreement ("CIA") with the Office of Inspector General of the U.S. Department of Health and Human Services that, among other things, required Abbott to reform its sales and marketing practices. The October 9, 2003 Abbott CIA bound the current and future Abbott Directors to its terms. The CIA was in effect until October 2008, and so bound each of the Director Defendants and each of the former director Defendants.

128.     The requirements of the CIA further heightened Defendants' awareness of the need to prevent off-label marketing.  The CIA required Abbott to revise its Code of Conduct to make unmistakably clear the Director Defendants and Abbott had to comply with the requirements of the FDCA, the FDA, Medicaid, Medicare and other applicable statutes and of the key role of the Board of  Directors in ensuring compliance with these laws by Abbott employees:

**Principle 8: Compliance With Laws**

We are required to familiarize ourselves with all the laws, rules and regulations that apply in the areas within the scope of our work responsibilities, including, as applicable, the following areas. Contact the Legal Division for advice in any area where you have questions.

**Food and Drug Laws**

We will comply with all laws, rules, and regulations applicable to our work responsibilities in every country in which Abbott does business.

We must comply with all applicable laws, rules, regulations, consent decrees and other orders of the United States Food and Drug Administration and any other similar governmental authorities in other countries where Abbott does business governing research, development, manufacture, distribution and promotion of foods,

drugs, medical devices, diagnostic products, nutritional products or biological products…

\* \* \*

**Laws Relating to Government Health Care Programs**

We must comply with the laws relating to government health care programs in each country where Abbott does business.

In the United States, its territories and possessions, and Puerto Rico, many Abbott products are reimbursed or purchased by Federal Health Care Programs – programs that include Medicare, Medicaid, Department of Defense and Department of Veterans Affairs health care programs, and many other Federal or Federally-funded programs that pay for health care items and services. These programs are regulated through a variety of laws affecting the coverage and reimbursement of Abbott products, as well as the sale and marketing of those products.

Abbott is committed to full compliance with all Federal Health Care Program requirements, including the following:

> **Federal Anti-kickback Statute**
>
> The laws that regulate these programs include the Federal anti-kickback statute, which applies both to our sales and marketing activities and to a broad range of other activities, including grants, research contracts, and consulting agreements. It generally prohibits offering or paying (or soliciting or receiving) cash or other benefits to induce the purchase, order, or recommendation of products eligible for payment by a Federal Health Care Program. . .
>
> **False Claims Laws**
>
> The civil False Claims Act and other statutes prohibit knowingly or recklessly submitting false claims to the Government, or causing others to submit false claims. Accordingly, we must exercise care to ensure that we do not submit any inaccurate or otherwise improper claims for payment to the Government, or cause others to do so. Abbott contracts with Government customers and must avoid submitting any claims for payments not properly due. While Abbott does not itself submit claims to insurance programs like Medicare and Medicaid, many of our customers do. We must avoid any conduct that could lead customers to submit false claims by following procedures carefully designed to ensure that any information we provide to customers about Medicare or Medicaid reimbursement for our products is accurate and otherwise proper.

\* \* \*

46

**Civil Monetary Penalties Law**

This law authorizes the imposition of civil monetary penalties for a variety of conduct. . . . Failure to adhere to Federal Health Care Program requirements, or to related Abbott standards, policies and procedures, can have a number of serious consequences, both for Abbott and for the individuals involved. . . . *[V]iolation of these laws may result in exclusion of Abbott or individual employees from participation in Federal Health Care Programs…* (emphasis added).

129. Under the CIA, all of the Director Defendants were required to certify in writing that they had "received, read, understood" this Code of Conduct and would "abide" by them. Further, the CIA mandated that the Director Defendants receive "reasonable and appropriate general training" concerning the "requirements of the CIA" and Abbott's compliance program, including the mandate that Abbott and the Director Defendants comply with Federal health care program requirements and the laws applicable to reimbursements made through Federal health care programs, including the False Claims Act.

130. ███████████████████████████████████████

████████████████████████████

████████████████████████████████████
███████████████████████████████████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
██████████████████████████████

131.    Further, over the past fourteen years, Abbott has received no fewer than *fourteen* letters from the FDA concerning off-label promotion of many different drugs, including letters in 1998 and 2009 concerning the off-label marketing of Depakote products.  On July 26, 1998 then CEO Duane Burnham was warned that Abbott had distributed materials falsely promoting Depacon Injection for the treatment of "status epilepticus" - a serious medical emergency where a patient suffers prolonged, or a cluster of almost non-stop seizures.  Moreover, the illegal marketing was a systemic marketing practice.  It involved regional and district managers providing misleading articles to Abbott sales representatives for dissemination to physicians touting Depacon's effectiveness in treating status epilepticus.  Indicating an even more fundamental failure of internal control over compliant marketing processes, nobody at Abbott had submitted the misleading marketing material to the FDA for approval in accordance with the post-marketing reporting requirements for labeling and advertising.  21 C.F.R. §314.81(b)(3)(i).

132.    The fourteen letters dated from 1997 to 2009 from the Division of Drug Marketing, Advertising and Communications of the FDA were received by Abbott executives at Abbott headquarters and reported systemic off-label marketing of various products such as Kaletra, HUMIRA injections, Ultane, Hydra, Hytrin, Zyflo, Biaxin, Mivacron, Norvir, Survanta and Depakote ER.  Despite the enhanced responsibilities of the Board of Directors set forth in the 2003 Corporate Integrity Agreement, the systemic off-label marketing continued by Abbott executives, the warnings continued to be made by the FDA, and the Individual Defendants continued to consciously disregard the unlawful conduct and warnings.  The FDA letters include the following:

a)    Letter dated March 17, 1997 from the Regulatory Review Officer, Division of Drug Marketing, Advertising and Communications of the FDA to Abbott executive David T. Guzek, Director, Regulatory Administration, Hospital Products Division at Abbott headquarters warning

Abbott to immediately discontinue its advertisement placed in a nationwide publication entitled *Anesthesiology* for the drug Ultane, because the advertisement promoted was not approved for the product;

b)     Letter dated May 6, 1997 from the Regulatory Review Officer, Division of Drug Marketing, Advertising and Communications of the FDA to Abbott executive Jill Lynch, Regulatory Affairs Specialist at Abbott headquarters informing her that materials in a journal advertising the "use and efficacy" of the product Hydra were false and must be immediately discontinued;

c)     Letter dated June 10, 1997 from the Regulatory Review Officer, Division of Drug Marketing, Advertising and Communications of the FDA to Abbott executive Jill Lynch, Regulatory Affairs Specialist at Abbott headquarters, warning Abbott to immediately discontinue a misleading advertisement for its drug Hytrin (terazosin);

d)     Letter dated June 27, 1997 from the Regulatory Review Officer, Division of Drug Marketing, Advertising and Communications of the FDA to Abbott executive Michael Sliwoski, PPD Regulatory Affairs, Advertising at Abbott headquarters concerning Abbott's alleged promotion misstating the efficacy of the drug Zyflo that was being disseminated by *sales representatives across the country* and was included in sample packages of Zyflo given to health care professionals;

e)     Letter dated August 15, 1997 from the Regulatory Review Officer, Division of Drug Marketing, Advertising and Communications of the FDA to Abbott executive Barbara Hagins, Regulatory Affairs Specialist, Advertising, at Abbott headquarters, warning that promotional materials for the drug Biaxin were misleading because they failed to present adequate risk information, and ordering Abbott to immediately discontinue such ads;

f)     Letter dated September 18, 1998 from the Regulatory Review Officer, Division of Drug Marketing, Advertising and Communications of the FDA to Abbott executive Ann Karen

Henry, Director, Regulatory Affairs, Advertising at Abbott headquarters, warning Abbott to immediately discontinue its false promotion of Biaxin in posters, leaflets and on Abbott's home page;

g) Letter dated January 18, 2001 from the Regulatory Review Officer, Division of Drug Marketing, Advertising and Communications of the FDA to Abbott executive Thomas Willer, Associate Director, Regulatory Affairs at the Hospital Products Division of Abbott Labs, warning that Abbott's professional sales aid of the drug Mivacron misleadingly claims there is no competitive drug with similar efficacy -- a false statement -- and neglecting to accurately state the risks of Mivacron;

h) Warning Letter dated June 10, 2004 to Miles D. White, from the Director of the Division of Drug Marketing, Advertising, and Communications regarding misleading brochures, comparison chart and promotional website all disseminated to a nationwide audience falsely promoting the HIV drug Norvir. The letter warned Abbott's Chairman and CEO that Abbott had failed to submit some of the promotional materials to the FDA as required by regulation, and that Abbott must cease the unlawful promotion and submit a plan with corrective actions;

i) Letter dated July 15, 2005 from the Regulatory Review Officer, Division of Drug Marketing, Advertising and Communications of the FDA to Abbott executive Elizabeth M. Zola, Associate Director, Regulatory Affairs at Abbott headquarters, warning that a direct mailer sent to physicians nationwide promoting the drug Survanta overstates the efficacy and minimizes risks of developmental disabilities in infants who receive Survanta;

j) Letter dated October 29, 2004 from the Consumer Promotion Analyst, Division of Drug Marketing, Advertising, and Communications to Abbott executive Greg Murawski, Manager,

Regulatory Affairs, regarding false advertising of Kaletra in nationwide direct-to-consumer ads (misleading impression concerning the effectiveness of the drug, and lack of risk information);

k)      Letter dated December 16, 2008 from the Regulatory Review Officer, Division of Drug Marketing, Advertising and Communications of the FDA to Abbott executive Mary Ann Huizenga, Regulatory Affairs Manager, at Abbott headquarters, requiring immediate cessation of nationwide ad for the drug Humira in the American Academy of Dermatology for falsely broadening the indications of the drug beyond the FDA's approval;

l)      A July 14, 2009 Warning Letter from the FDA to Miles D. White, Chairman of the Board & Chief Executive Officer, warning Abbott to immediately cease and desist from making false claims about the efficacy and safety risks of the drug Kaletra, an HIV drug, directly to consumers; the letter states:

> DDMAC has expressed concerns regarding Abbott's promotion of Kaletra in an earlier letter. . . . We are concerned that you are continuing to promote your product in a similarly violative manner.

133.    It is public knowledge that on January 22, 2009, the Department of Health and Human Services sent Rick Leber a warning that Abbott was using "flashcards" that impermissibly broadened the indication for Depakote ER.  According to the letter, the flashcards misleadingly suggested that Depakote ER had a broader indication for treatment of mania than Depakote. The flashcards also omitted material information concerning Depakote ER in order to create the impression that Depakote ER would provide patients with some clinical benefit.  Accordingly, this promotional material violated the FDCA.  This misleading material was apparently part of a strategy to fight generic competition by converting Depakote users to Depakote ER.  While Abbott lost its patent for Depakote in mid-2008, it was able to maintain some patent protection for Depakote ER until early-2009.

134.　███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

135.　　In 2010, Abbott settled two additional cases involving the Company's illegal marketing and sales practices. The first, which arose out of a whistleblower complaint filed by Ven-a-Care of southern Florida in 2007, involved allegations of marketing the "spread" for certain Abbott drugs and violating the False Claims Act with respect to the Company's grossly inflated pricing of one of its antibiotics and some of its generic, water-based solutions primarily used to facilitate the intravenous infusion or injection of other drugs. Specifically, it was alleged that Abbott intentionally reported inflated prices, often in excess of 1000% higher than Abbott's actual prices, in order to attain higher levels of customer reimbursement and profit from Medicare and Medicaid. In conjunction with this settlement, Abbott agreed to pay $126.5 million to resolve the claims.

136.    The second case Abbott settled in 2010 involved the payment of $41 million to resolve criminal and civil liability arising from the illegal marketing of drugs Advicor and Niaspan by the Company's subsidiary Kos Pharmaceuticals ("Kos"). In that case, "The United States contend[ed] that Kos promoted the sale and use of Advicor for use as first-line therapy for management of mixed dyslipidemias… Such an off-label use was not approved by the Food and Drug Administration nor was it a medically-acceptable indication for which the United States and state Medicaid programs provided coverage for Advicor." It was further alleged that Kos offered and paid doctors, other medical professionals, physician groups and managed care organizations, illegal kickbacks in the form of money, free travel, grants, honoraria and other valuable goods and services, in violation of the Anti-Kickback Statute to get them to prescribe or recommend Niaspan and Advicor.  The unlawful marketing conduct by Kos, broadening the indications for use of the product beyond FDA approval and bribing health care professionals in exchange for writing prescriptions is identical to the conduct the Company engaged in to unlawfully drive up sales of Depakote.

137.    The foregoing show that Abbott's practice of off-label marketing of its various products continues to this day despite over a decade of warning letters, consent decrees, hundreds of millions of dollars in fines, and criminal prosecution.  This pattern of law breaking indicates a compelling need for implementation of the enhanced internal controls demanded by this Plaintiff in its request for relief.

**4.**    ███████████████████████████████████████████

138.    It is the Director Defendants' job to learn about the major aspects of Abbott's operations and ensure that those operations fully comply with the law.  Abbott's Corporate Governance policy defines the Board's responsibility as follows:

"The board of directors shall review and, where appropriate, approve fundamental operating, financial, risk management, and other corporate strategies, as well as other major plans and objectives and shall monitor the effectiveness of management policies and decisions, including the execution of strategies."

Further,

"Directors shall comply with all laws, rules and regulations applicable to their capacity as directors of Abbott."

139.    Further, as described above, the Director Defendants knew that they were obligated under the terms of the CIA to ensure that they and Abbott complied with the FDCA, FDA, Medicaid, Medicare and other applicable statutes.   Indeed, in addition to acknowledging in writing that they would follow these laws as required by the CIA and Abbott's Business Code, ███████

████████████████████████████████████████████████████

140.    ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

141.    ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████    ████████████████████████████

142. ████████████████████████████████████

143. ████████████████████████████████████

144. ████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████

145.     ████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████

146.     ████████████████████████████████████

█████████████████████████████████████████████████████████

147.

148.

149. ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████

150. ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████

151. ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████

152. ████████████████████████████████████████████████
████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████

153.    ████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████

154.    ████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

155.

**D.    The Government Investigation**

156.

Nevertheless, neither the 10-Q issued on May 5, 2009 nor the one issued on

August 7, 2009 made any mention of the DOJ's pending investigation.

157.    On November 6, 2009, Abbott, for the first time, reported in its Form 10-Q that the

Department of Justice had begun an investigation into Abbott's sales and marketing activities for

Depakote. According to the disclosure, "the government is seeking to determine whether any of

these activities violated civil and/or criminal laws, including the Federal False Claims Act, the Food

and Drug Cosmetic Act, and the Anti-Kickback Statute in connection with Medicare and/or Medicaid reimbursement to third parties." Abbott continued using this same disclosure in each of the next two annual reports it filed with the SEC.

158.    In its March 2010 proxy, Abbott disclosed that it had advanced defense costs on behalf of three former officers in connection with the government investigation. In its March 2011 proxy, Abbott disclosed that the government investigation had expanded such that the Company had advanced defense costs on behalf of two current and five former officers.

159.    Among other things, the Government sought all e-mails sent or received by thirteen individuals from 1996 through 2008 as part of its investigation into potential federal violations arising out of Abbott's impermissible off-label marketing of Depakote as a treatment for agitation and aggression in the elderly, and health care fraud arising out of that allegedly improper use. Eventually, the Government had to move to compel Abbott to produce the e-mails of three people (Defendants Dempsey, White, and Leiden), which the court granted. The emails related to Depakote and off-label marketing of other FDA approved drugs.

160.    On February 4, 2011, the DOJ elected to intervene in a whistleblower lawsuit filed in late 2008 by former Abbott sales representatives and unsealed a redacted version of its Complaint against Abbott involving the Company's illegal scheme to promote Depakote.

161.    On October 19, 2011, Abbott, for the first time, announced that it would record a charge of *$1.5 billion* to cover a potential settlement with the federal government and twenty-four states. It was reported that Abbott had agreed to pay $800 million to resolve civil claims over Depakote and $500 million in criminal penalties, which would make the settlement one of the largest in history for off-label marketing. This settlement has not been finalized. Further, it is not known

what, if any, other conditions will be attached to the settlement and whether the federal government or any states will seek to hold any of Defendants civilly or criminally liable for their actions.

## **DEMAND IS FUTILE**

162.     Plaintiff brings this action derivatively in the right and for the benefit of Abbott to redress the Individual Defendants' breaches of fiduciary duties and violations of law as alleged herein, and to require that the Company undertake corporate governance reforms to prevent similar harm to the Company in the future.

163.     Plaintiff is an institutional shareholder, fully understands and is prepared to meet its Rule 23.1, Federal Rule of Civil Procedure obligations to adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

164.     Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants.  Such demand would be a futile and useless act because a majority of the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

165.     Plaintiff incorporates by reference all preceding paragraphs as though they were fully set forth herein.

166.     Demand is futile because the decision to allow Abbott employees to engage in off-label marketing of Depakote was not in good faith and is not protected by the business judgment rule.

167.     Demand is futile because each of the eight Director Defendants, White, Fuller, Austin, Farrell, Scott, Tilton, Osborn, and Alpern, face a substantial likelihood of liability for consciously allowing Abbott to engage in off-label marketing of Depakote.

168.

169.



170.     Demand is excused because the Director Defendants face a substantial likelihood of liability under the FCA.  The FCA imposes liability on "[a]ny person" who, *inter alia*, "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval."  Because the Director Defendants knew that Abbott's employees were engaging in off-label marketing that induced government healthcare programs to pay for Depakote prescriptions that were not medically justified, they may be subject to liability for "causing" false claims to be submitted to the U.S. Government. Each violation of the FCA subjects the violator to a civil penalty of not less than $5,500 and not more than $11,000 for each violation.  In addition, a violator is liable for three times the amount of all damages sustained by the U.S. Government.  Thus, the Director Defendants have a strong economic incentive to prevent the further investigation and exposure of their role in causing Abbott to violate the FCA.   Indeed, the complaint in the *U.S. ex. rel Spetter*, which alleges off-label marketing between January 1, 1998 and January 1, 2009 and FCA claims arising out of the same conduct, names as defendants John Does 1-100, the co-conspirators for the wrongdoing alleged therein.

171.    Demand is futile because each Director Defendant faces a substantial likelihood of liability for the breach of fiduciary duty claims alleged in this complaint against them.  It is beyond dispute that directors of a company cannot operate the company they control in an illegal manner, even if they believe that doing so will benefit the company financially in the short term.  The Director Defendants were aware of the fact that Abbott was engaged in off-label marketing, but allowed the off-label marketing to continue.  This is a clear breach of their fiduciary duty.

## COUNT I

### Derivative Claim Against All
### Defendants for Breach of Fiduciary Duty

172.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

173.    Defendants knowingly, willfully and/or intentionally breached their duties of loyalty and good faith by knowingly concealing and/or allowing the concealment of material facts from Abbott shareholders.

174.    As officers and/or directors of a publicly held company, the Defendants had a duty to act in the best interest of the Company's shareholders and to refrain from either knowingly or recklessly engaging in wrongful conduct themselves, or financially rewarding others for falsifying Company records and other misconduct.  In addition, at all times, the Defendants had a duty to promptly disseminate accurate and truthful information with respect to Abbott's operations and affairs.  The Defendants instead concealed their wrongdoing and, as a result thereof, disseminated false and misleading statements and reports about Abbott.

175.    The Defendants, in their roles as executives and directors of Abbott, participated in the acts of mismanagement alleged herein, and knowingly, willfully, and/or intentionally disregarded

adverse facts known to them, and did nothing to reveal them. They thereby breached their fiduciary duties of care, loyalty, accountability and disclosure to Abbott and its shareholders.

176.  The Defendants each further owed a fiduciary duty to Abbott and to Abbott's stockholders to seek redress from those whose conduct has caused and will cause the Company to expend its assets and whose conduct has otherwise precipitated the potentially illegal activities alleged herein. The Defendants have not done so.

177.  All Defendants breached and/or aided and abetted these breaches of fiduciary duties owed to Abbott and its shareholders.

178.  The conduct outlined herein was not due to an honest error of judgment, but rather was due to the Defendants' bad faith and was done knowingly, willfully and/or intentionally, and resulted in losses to Baxter and its shareholders.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of Abbott, demands judgment as follows:

A.  Declaring that the Defendants, and each of them, have committed breaches of their fiduciary duties to Abbott, abused their control, grossly mismanaged Abbott, and committed the potentially illegal and clearly improper actions complained of herein;

B.  Requiring the Defendants to pay Abbott the amounts by which the Company has been damaged by reason of the conduct complained of herein and to indemnify Abbott for any claims brought against Abbott by any of its officers, directors, employees, or by any third party;

C.  Entering equitable and/or injunctive relief as permitted by law, including disgorging, attaching, impounding, imposing a constructive trust on or otherwise restricting the value of the proceeds of Defendants' other assets so as to assure that Plaintiff on behalf of Abbott has an effective remedy;

D.  Directing Abbott to take all necessary actions to reform and improve its corporate

governance and undertake all reasonable corporate governance reforms necessary to ensure that the wrongdoing alleged in this Complaint does not recur.

E.      Ordering that the Defendants personally bear their own legal fees in defending any and all claims arising out of these matters, whether asserted by stockholders or the government, and not be indemnified by the corporation or any insurance;

F.      Awarding punitive damages;

G.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees;

H.      Granting extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provision sued hereunder, including enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from further enriching themselves at the expense of the Company; and

I.      Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: April 10, 2012                    FREED KANNER LONDON & MILLEN LLC


                                         /s/ Michael J. Freed
                                         Michael J. Freed
                                         2201 Waukegan Road, Suite 130
                                         Bannockburn, IL 60015
                                         Telephone:  (224) 632-4500
                                         Facsimile:  (224) 632-4521
                                         Email:  mfreed@fklmlaw.com

                                         Judith S. Scolnick
                                         Thomas L. Laughlin, IV
                                         Donald A. Broggi
                                         SCOTT+SCOTT LLP
                                         500 Fifth Avenue, 40th Floor
                                         New York, NY  10110

Telephone:  (212) 223-6444
Facsimile:  (212) 223-6334
Email:  jscolnick@scott-scott.com
          tlaughlin@scott-scott.com
          dbroggi@scott-scott.com

*Counsel for Pipefitters Local Union No.*
*120 Pension Fund*